**DORSID TRADING COMPANY,**
**Plaintiff,**

v.

**S/S MULHEIM RUHR, her engines,**
**tackle, etc., et al., Defendants.**

**Civ. A. No. 68-H-425.**

United States District Court,
S. D. Texas,
Houston Division.

July 22, 1971.

---

Michael S. Wilk, Hirsch, Westheimer & Block, Houston, Tex., for plaintiff.

Ben L. Reynolds and Alan B. Steber, Royston, Rayzor & Cook, Houston, Tex., for defendants.

## MEMORANDUM AND ORDER

NOEL, District Judge.

This is a cargo claim asserted by a shipper to recover from a carrier for alleged rusting and bending damage to a transatlantic shipment of steel beams. The cause was tried as to liability on June 10, 1971, and the Court now enters its findings of fact and conclusions of law, Rule 52, Fed.R.Civ.P., which supersede in all respects its previous oral ruling.

### Findings of Fact

(1) In the spring of 1967, a cargo of European steel was loaded aboard the defendant S/S Mulhelm Ruhr at the Port of Antwerp, Belgium. This vessel was chartered by defendant Atlantic Shipping Company.

(2) This cargo consisted partly of wide-flange steel beams and was to be delivered for plaintiff, Dorsid Trading Company, at the Port of Houston, Texas.

(3) At the time of onloading, bills of lading were issued covering the steel in issue. These bills were claused with the following notation: "Partly rust stained before shipment."

(4) The cargo was stowed in the ship's Number 2 hold, which was secured by a hydraulic hatch cover of a type considered highly reliable.

(5) The voyage was uneventful and weather conditions were normal.

(6) The ship arrived at Houston on May 7, 1967, and plaintiff's cargo was discharged ten days later. Timely notice of damage was given.

(7) The beams then travelled by rail to plaintiff's affiliated warehouse where they were stored both inside and outside the shelter. The unsheltered portion of the cargo was covered by polyethylene sheets.

(8) During the trip from the port to the warehouse, the steel was stacked in open gondola cars and was exposed to a moderate amount of rainfall.

(9) After arrival of the steel at the warehouse, the rust exhibited a slight chloride and minute sulfate content, despite its intervening exposure to rainwater. The origin of this small degree of mineralization, however, was demonstrated to be consistent with numerous reasonable hypotheses other than salt-water wetting during the ocean voyage.

(10) As the aforementioned compounds, particularly chlorides, are present in large relative amounts in sea-water, their residual presence in a rust sample *may* be indicative that the corrosion is of marine origin. However, according to the expert testimony, this indicium is distorted to the point of unreliability if the rust sample has been subjected to fresh-water leaching during an interim period. After such leaching has caused dissolution of soluble salts, quantitative analysis of the remaining material is a precarious basis for estimating the pre-leaching composition of the rust. In the instant case, although plaintiff's expert chemist concluded that the rust was caused by seawater, the foundation of this conclusion is shaken when it is considered that his available data provided no real basis for estimating the chloride content of the rust prior to its rainwater wetting in the gondola cars. Defendant's expert chemist testified that the presence of chlorides was not the result of saltwater wetting. The Court agrees with the latter view.

(11) Although the evidence is in conflict as to the extent of the rust damage, the Court finds that the rusty condition of the steel when offloaded at Houston represented no more than a normal atmospheric progression of the condition noted at the time of onloading at Antwerp.

(12) It follows from the above that the cargo was not during the course of the voyage exposed to seawater.

### Conclusions of Law

(1) The Court has jurisdiction over the parties and of the subject matter. 28 U.S.C. § 1333; Rule 9(h), Fed.R. Civ.P.

(2) Defendant Atlantic Shipping Company was the carrier of cargo within the meaning of the United States Carriage of Goods by Sea Act, 46 U.S.C. § 1300 et seq.

(3) The portion of plaintiff's claim relating to bending damage has been settled, and is not here at issue.

(4) A bill of lading is prima facie evidence of the receipt by the carrier of the goods as therein described. 46 U.S. C. § 1303(4).

(5) The notation "partly rust stained" upon these bills of lading accurately denoted a condition of rust which existed at the time of onloading. Plaintiff's contention that this phrase is meaningless, by reason of a usage peculiar to Antwerp, is not persuasive. The Court concludes that the notation meant what it said.

(6) Therefore, the bills of lading were not clean bills.

(7) In view of the unclean bills, as Judge Garza of this Court has noted, "the plaintiff has the burden of showing that the rust [the steel] arrived with was not the same rust it had at its loading, or a progressively worsening condition of the rusting in a natural sequence of events." Dorsid Trading Company v. S/S Evgenia, 68-H-119 (S.D.Tex., March 13, 1970).

(8) Plaintiff has not discharged this burden. To the contrary, the Court has found that the rust condition upon delivery was the same as that observed at onloading, accentuated only by the passage of time and the normal atmospheric factors incident to the voyage.

Accordingly, judgment shall enter for the defendants.